IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-02052-JLK-MEH

In re Alison Maynard and Gerald Lewis civil rights litigation.

_____

ALISON MAYNARD, and
GERALD LEWIS,

      Plaintiff,

v.

THE COLORADO SUPREME COURT OFFICE OF ATTORNEY REGULATION COUNSEL,
et al.,

      Defendants.

_____

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

**Michael E. Hegarty, United States Magistrate Judge.**

      This matter comes before the Court pursuant to the Order of Reference issued by Judge Kane

on March 29, 2011 [docket #202].  The Court held a Status Conference on May 11, 2011 to discuss

the parties' status reports and hear further information concerning the substance of the Plaintiffs'

claims against Defendants in accordance with Judge Kane's order.  For the following reasons, the

Court respectfully recommends that Plaintiffs be denied permission to file an Amended Consolidated

Complaint in this matter.[1]

_____

[1]Be advised that all parties shall have fourteen (14) days after service hereof to serve and
file any written objections in order to obtain reconsideration by the District Judge to whom this
case is assigned.  Fed. R. Civ. P. 72(b).  The party filing objections must specifically identify those
findings or recommendations to which the objections are being made.  The District Court need not
consider frivolous, conclusive or general objections.  A party's failure to file such written
objections to proposed findings and recommendations contained in this report may bar the party
from a de novo determination by the District Judge of the proposed findings and recommendations.
*United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the
failure to file written objections to the proposed findings and recommendations within fourteen
(14) days after being served with a copy may bar the aggrieved party from appealing the factual

## BACKGROUND

I.     **Statement of Facts**

This Court has constructed the following statement of facts, set forth primarily in chronological order, based upon a review of the Complaints filed in 09-cv-02052-JLK-MEH[2] and 10-cv-01850-JLK-MEH,[3] the Joint Status Report filed by the Defendants on April 15, 2011, the Plaintiffs' Status Report filed May 4, 2011, and the statements made by the parties at the May 11, 2011 Status Conference.

1.     Spring Creek Ranch, located in Summit County, was initially developed by the Spring Creek Development Company ("the Developer") in the 1980s. The Developer acquired 6,000 acres of land and appurtenant agricultural water rights (the "Water Rights"), with the intent of developing a large-scale residential and commercial development. The original planned unit development ("PUD") contemplated 303 units on approximately 6,000 acres. The property was to be developed in two phases, but only Phase I was approved. Phase I divided some 300-plus acres into thirty-two (32) five-acre lots with 155-acres of open space.

2.     On November 29, 1982, the Developer secured a Colorado Water Court decree in Case No. 80CW504, which approved a plan for augmentation to utilize some of the Water Rights

findings of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991); *Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1164 (10th Cir. 1986).

[2]This Court is unclear whether Plaintiffs intend to pursue the claims raised in 09-cv-02052, given Maynard's statements in Plaintiffs' Motion to Strike Defendants' Motion to Dismiss that her attempts to amend the complaint would have "mooted" the motion to dismiss, but after they were denied, the amendments, including the same or similar claims raised in 09-cv-02052, were then raised in a new case, 10-cv-01850. Nevertheless, in an effort to address Plaintiffs' claims fully, the Court will address and analyze Plaintiffs' allegations raised in 09-cv-02052 to the extent they are different than those raised in 10-cv-01850.

[3]Ms. Maynard asserted at the hearing that "the complaints themselves are a detailed chronology" which "are exactly what the Court appears to be requiring ... so that is what I'm offering again." Transcript of May 11, 2011 Status Conference at 5: 20-23, docket #239.

historically associated with the property for purposes of providing a domestic and commercial water supply. This decree provided for 175 acre-feet of water per year "at full development." The Developer then drilled a community well for Phase I, which was originally the sole source of water for Phase I.

3.       Before the Developer undertook the development of Phase II, it defaulted on the mortgage for the Spring Creek Ranch development. At that point, the mortgage holder (Metropolitan Life Insurance Company, hereinafter "Metropolitan") foreclosed on the Spring Creek Ranch development, which included all of Phase I (except for the individual lots already sold to homeowners), the Water Rights and the land that was going to be developed in Phase II.

4.       Metropolitan completed a foreclosure under the deed of trust, and it became the record owner of all portions of the land and the Water Rights, excluding approximately 35 acres of the Phase I Property.

5.       At the time of the foreclosure, only seven of the five-acre lots within the Phase I Property had been sold to individual homeowners.  Plaintiff Gerald Lewis owned one of these lots with his spouse Halena Lewis.

6.       On March 9, 1981, the Spring Creek Ranchers Association, Inc. (the "SCRA") was established to act as an agent for the owners of residential lots within the Phase I Property (individually referred to as "Lot Owners").

7.       Defendants allege that on May 26, 1989, Metropolitan, Nelson and Catherine Lane (the "Lanes"), individual Lot Owners of Phase I, and the SCRA entered into a Settlement Agreement (hereinafter "1989 Settlement Agreement"), to clarify the rights and responsibilities of the parties. The 1989 Settlement Agreement entitles the SCRA and Lot Owners to use water for in-house domestic use inside fourteen single family residences.

8.       Defendants claim as partial consideration for finalization of the 1989 Settlement

Agreement, the Lanes and Metropolitan made arrangements to deed the majority of the remaining Phase I Property to the SCRA, consisting of approximately 300 acres.

9.      In addition, the Lanes paid the SCRA a settlement fee of $110,000. The 1989 Settlement Agreement indicated that this $110,000 was to be used at the full discretion of the SCRA.

10.      The Summit County Board of Commissioners then passed Resolution 89-60, making the SCRA and the Lot Owners responsible for the obligations of the PUD. The Lanes had their property rezoned as a working cattle ranch.

11.      On July 20, 1989, Metropolitan executed Special Warranty Deeds to the SCRA and the Lanes as part of the 1989 Settlement Agreement. The SCRA received all of the Phase I Property of the Spring Creek Ranch development (excluding the seven individual lots which were already owned by the Lot Owners), along with the water well site, the water storage tank, and the refuse site. The Lanes were conveyed all of the Water Rights and all of the remaining land.

12.      Defendants allege the conveyance from Metropolitan to the Lanes expressly included specific Water Rights related to the undeveloped property. No water was conveyed in the deed to the SCRA.

13.      Defendants claim the Water Rights conveyed to the Lanes were specifically listed as excluded from the SCRA's deed.

14.      To ensure sufficient water for the Phase I Property of Spring Creek Ranch and in an effort to get the community well properly permitted, the SCRA entered into a forty-year contract with the U.S. Bureau of Reclamation, Department of the Interior for water service from the Green Mountain Reservoir in 1991.

15.      In 1993, the SCRA filed Case No. 93CW213 in water court.

16.      Around 1997, a dispute between two factions of the then existing seven Phase I Lot Owners led to the selection of a new board of directors for the SCRA. The former board members

became the protesting lot owners and later hired Plaintiff Maynard to represent them. The protesting lot owners included Plaintiff Gerald Lewis, Halena Lewis, Kenneth & Joyce McNichols, Joseph & Marguerite Sergent, and for a limited time Richard & Jacqueline Wade (hereinafter referred to as "Protestors").

17.     Defendants allege on April 9, 1999, Elk Dance Colorado, LLC ("Elk Dance") purchased the majority of the property owned by the Lanes, with the exception of approximately 70 acres retained by the Lanes adjacent to their private residence. Elk Dance also purchased from the Lanes all the Water Rights originally owned by the Developer and appurtenant to the Elk Dance Property, which includes ownership of the water rights and augmentation plan decreed in Case No. 80CW504.

a.      Elk Dance purchased the property and the Water Rights in order to create a small-scale residential ranch development, consisting of 21 homes, a lodge, and an equestrian facility, known as Shadow Creek Ranch.

b.      On January 8, 2001, Elk Dance received a final water court decree in Case No. 00CW99, which changed the point of diversion of one of Elk Dance's wells originally decreed and augmented in Case No. 80CW504.  Defendant Glenn Porzak represented Elk Dance as water counsel on this matter.

c.      On August 2, 2001, Elk Dance conveyed all of the Water Rights to Shadow Creek Ranch, which serves as the agent for the future owners of the 21 home sites and the Lanes' remaining 70 acres, which has also been incorporated into Shadow Creek Ranch.

d.      On May 1, 2003, Elk Dance (predecessor in interest to Shadow Creek Ranch) received a final water court decree in Case No. 00CW302, which decreed an additional change to Elk Dance's augmentation plan, originally decreed in Case No. 80CW504, and allowed Elk Dance to utilize individual, on-site septic systems or a central on-site treatment plant for waste water

treatment. Defendant Glenn Porzak represented Elk Dance/Shadow Creek Ranch as water counsel on this matter.

18.     Defendants state that in 1999, after the SCRA could not obtain the protesting lot owners' consent to go forward with the agreements with the Lanes and Elk Dance, the SCRA sought declaratory relief in the Summit County District Court, Case No. 99CV277.  The named defendants included four Lot Owners within the SCRA, hereinafter referred to as the "Protestors": Halena Lewis, Joyce and Kenneth McNichols, Joseph and Marguerite Sergent, and Richard and Jacqueline Wade.

19.     Plaintiff Lewis alleges that after the initial filing in 99CV277, Defendant Boog (counsel for the SCRA) in consultation with Defendant Porzak, injected new claims adversely affecting his property rights to accomplish inserting new board members into the SCRA, including Defendant Swenson, and changing the board's governing documents, which benefitted Elk Dance, Swenson, Defendant Bruce Anderson and Defendant Judith Anderson personally.

20.     In August of 2000, a proposed Addendum to the 1989 Settlement Agreement (hereinafter "2000 Addendum") sought to clarify the volume of the use right available for use by the Lot Owners and the SCRA under the 1989 Settlement Agreement.

21.     The 2000 Addendum provides that the Green Mountain Reservoir contract water would be the primary augmentation source for the seven existing homes, plus seven additional single-family residences, for a total of fourteen homes. It further provides that if the Green Mountain Reservoir contract water is not renewed or is insufficient to meet the needs of fourteen single family residences or if an additional source of water is required, that Elk Dance would make available a maximum of 5.85 consumptive acre-feet of water per year to the SCRA from Elk Dance's water rights, which equates to approximately 5% of the total water decreed in Case No. 80CW504.

22.     In their answer filed in 99CV277, Halena Lewis and Richard & Jacqueline Wade

asserted counterclaims, alleging that they and the SCRA, not the Lanes, had been granted water rights under the augmentation plan approved in the water court case no. 80CW504, and that the proposed 2000 Addendum effectively stole their vested water rights. They also alleged that the new SCRA Board of Directors were not duly elected and could not act on their behalf; therefore, any agreement the SCRA entered into with Elk Dance was void and unenforceable.

23.      Plaintiff Lewis alleges that Defendant Porzak had tried without success on several occasions to persuade him to sign different versions of the 2000 Addendum.  Lewis claims that both Defendant Lane and Defendant Swenson threatened him with physical and economic harm if he did not sign the Addendum.

24.      Plaintiff Lewis alleges that the 2000 Addendum improperly required him to stipulate to a water referee's ruling which affirmed the transfer of the augmentation to Elk Dance in exchange for an inadequate water supply for the Spring Creek Ranch subdivision.

25.      In Case No. 99CV277, evidence was presented at a three-day trial in November 2001 regarding what an adequate amount of water would be for domestic use for fourteen single family residences.  Defendants contend Holly Holder testified that the standard for in-house domestic use is 0.29 acre-feet per year per house. For fourteen single family residences, the total need, according to Ms. Holder, would be around 4.1 or 4.2 acre-feet per year. The 2000 Addendum provides for 5.85 acre-feet per year, which exceeds the actual standard need. This agreement was incorporated into the final water court decree in Case No. 93CW213 entered on September 22, 2005.

26.      Plaintiff Lewis alleges that Boog knowingly suborned false testimony from Ms. Holder that the Spring Creek Ranch well was not augmented, although she knew there was a plan for augmentation decreed for Spring Creek Ranch, which needed only a change in the legal description of the well.

27.      Lewis claims Holder, who represented the SCRA, was paid by Elk Dance, Lane and

Porzak to give the false testimony and to amend the application in 93CW213 to add Lane's property as property to be augmented and served by the SCRA as well without the consent of the Spring Creek Ranch homeowners.  Lewis asserts that Holder was offered or given a vacation at a condo owned by Swenson's mother in exchange for the false testimony and amendment.  Lewis claims that when Holder was challenged by the Spring Creek Ranch homeowners for her actions at a meeting, she burst into tears and begged Halena Lewis to fire her.

28.     On January 28, 2002, Defendant Judge David Lass entered a judgment in 99CV277. According to Defendants, the court:

a.      Found that the Board of Directors elected in 1997 (Defendant Robert Swenson, Lisa Lindley, and Clayton Beattie) for the SCRA was properly constituted and was authorized to conduct the business of the SCRA, including executing the 2000 Addendum to the 1989 Settlement Agreement. The court further noted that the Lot Owners are bound by the actions of the duly elected Board of Directors of the SCRA.

b.      Approved the 2000 Addendum to the 1998 Settlement Agreement and directed each of the Lot Owners to sign the 2000 Addendum. In the event that any of the Lot Owners refused to sign the 2000 Addendum, the Summit County District Court would direct the Clerk of the Combined Courts of Summit County to execute the documents on their behalf pursuant to C.R.C.P. 70.

c.      Found that the evidence demonstrated the Lot Owners and the SCRA did not own water rights under a previously approved augmentation plan in 80CW504.  Elk Dance, Shadow Creek Ranch's predecessor in interest, is the title owner of the augmentation plan decreed in Case No. 80CW504.

d.      Found the only interest that the SCRA has in Case No. 80CW504 is pursuant to the 1989 Settlement Agreement, which entitles them to use sufficient water for in-house domestic

use inside fourteen single family residences: "the evidence clearly shows that title to the water was conveyed from Metropolitan to the Lanes, and subsequently to Elk Dance, and not the individual Lot Owners. To the extent that the Lot Owners have any vested rights by law in the PUD Development, they do not include titled water rights, but rather a limited right to use of the water as granted in the [1989] Settlement Agreement."

e. Found the 2000 Addendum to the 1989 Settlement Agreement provides the SCRA with the right to utilize up to 5.85 consumptive acre feet of water from the augmentation plan decreed in Case No. 80CW504 at times when the SCRA's Green Mountain Reservoir Contract is unavailable. The 5.85 consumptive acre-feet of water equates to approximately 5% of the total water decreed in Case No. 80CW504.

29. The defendants in 99CV277 did not appeal Defendant Judge Lass' 2002 Final Judgment.

30. Defendants claim that, apparently because the Protestors were convinced that their water rights and associated augmentation plan were "stolen" from them, certain Protestors refused to pay homeowner assessments to the SCRA or sign documents such as the 2000 Addendum despite the order by Defendant Judge Lass.

31. On February 22, 2002, the SCRA went back to Defendant Judge Lass and requested relief as provided in Colo. R. Civ. P. 70. Specifically, they asked Defendant Judge Lass to appoint the Clerk of Combined Courts in Summit County to sign the 2000 Addendum on behalf of the Lot Owners who refused to do so.

32. On January 23, 2003, Defendant Judge Lass granted the SCRA's motion to appoint the clerk to execute a declaration of covenants as provided in the specific performance portion of his declaratory judgment order in 99CV277.

33. Plaintiff Lewis claims that Judge Lass acted improperly by failing to mention any

changes to the SCRA covenants in the 99CV277 judgment, but, more than a year later, ordered that the court clerk sign the Protestors' names to the new covenants pursuant to an order granting the Colo. R. Civ. P. 70 motion brought by Defendant Boog, who falsely claimed that the new covenants were covered by the judgment.

34.     Lewis alleges that Defendants Swenson, the Andersons and Lane (Elk Dance) knew in advance that Judge Lass would give them the outcome they sought in 99CV277.

35.     Lewis alleges that Defendant Lane compensated Defendants Boog, Swenson and the Andersons (referred to by Plaintiff Lewis as the "Swenson Group") to take actions meant to benefit Elk Dance, Swenson and the Andersons personally.

36.     Lewis alleges Defendants Swenson and the Andersons changed the covenants in material ways and recorded the changed covenants after the covenants were altered by Judge Lass.

37.     The SCRA eventually proceeded with the assessment of lien claims against Halena and Gerald Lewis to provide for the Phase I Property.

38.     Plaintiff Lewis alleges that the Swenson Group selectively imposed a fraudulent lien on his 35-acre property.  He claims that Boog caused a fraudulent deed of trust to be executed by Swenson and Anderson for Boog's benefit, which was recorded in Summit County in late 2003. Lewis asserts that Boog foreclosed on these fraudulent deeds of trust in Judge Lass' court, which caused the property to be sold at auction and purchased by Defendant Anderson for a fraction of its value.

39.     In addition, Lewis contends that in August and September 2004 and May and June 2006, Boog prepared and recorded fraudulent assessment liens at the direction of Swenson and the Andersons, some of which were recorded against Lewis' five-acre homesite.

40.     Halena Lewis, Kenneth & Joyce McNichols, and Marguerite Sergent through their attorney, Plaintiff Maynard, filed Case No. 03CA1718 and moved to set aside Defendant Judge

Lass' January 23, 2003 Order on the basis of fraud on the court. According to Defendants, the Court of Appeals found no basis for relief under Colo. R. Civ. P. 60(b) for fraud on the court.

41.     The Protestors subsequently moved to amend the notice of appeal to include the 2002 Final Judgment, alleging for the first time that the trial court lacked subject matter jurisdiction to enter certain portions of the 2002 Final Judgment.

42.     Defendants allege that, in response to the amended scope of the appeal, the court stated: "And, contrary to defendants' contention, a judgment does not perpetually remain vulnerable to attack on jurisdictional grounds. A party may not collaterally attack a final judgment when, as here, the party had the opportunity to challenge subject matter jurisdiction during the original action. … Consequently, notwithstanding defendants' jurisdictional challenge, any appeal from the January 2002 judgment filed now is, therefore, barred."

43.     The Protestors, represented by Plaintiff Maynard, also filed another appeal, Case No. 04CA709, collaterally attacking the 2002 Final Judgment in 99CV277.  The Colorado Court of Appeals ordered the Protestors to show cause, to which the trial court responded on July 28, 2004 that an appeal of the 2002 Final Judgment cannot be directly reviewed because there was no timely appeal. The Protestors withdrew the appeal before the court of appeals could address the issue further.

44.     On May 2, 2003, Plaintiff Maynard filed a Complaint in Summit County District Court, No. 03CV126, on behalf of the Protestors against the SCRA, Defendants Bruce & Judith Anderson, Defendant Robert Swenson, Defendant Victor Boog, and Victor F. Boog & Associates, P.C.

45.     One of the requests for relief in the complaint was to have 99CV277 made "null and void."

46.     The complaint alleged that the SCRA levied unauthorized assessments, breached a

contract, breached its fiduciary duty, engaged in civil conspiracy, extortion, *ultra vires* acts, fraud, intentional infliction of emotional distress, outrageous conduct, recording of fraudulent documents, and conversion, and challenged the legality of 2002 Final Judgment in 99CV277 and the constitutionality of Colorado Common Interest Ownership Act ("CCIOA").

47.     Defendants assert that all of the Protestors' claims in 03CV126 and counterclaims in 03CV357 and 04CW80 were dismissed with prejudice and later upheld on appeal in Case No. 08CA2649 on March 11, 2010.

48.     On June 27, 2003, Plaintiff Maynard filed a complaint in U.S. District Court, Case No. 03-M-01183, on behalf of the Protestors. The defendants included: the SCRA, Elk Dance, Defendant Robert Swenson, Clayton Beattie, Mary Ellen Beattie, Lisa Lindley, Defendant Bruce Anderson, Defendant Judith Anderson, Astrid Gifford, Kevin Smith, Donald Moorehead Jr., Donald Moorehead, Defendant Nelson Lane, Catherine Lane, Defendant Victor Boog, and Defendant Glenn Porzak.

49.     On behalf of her clients, Plaintiff Maynard alleged that the SCRA, the Lanes, Shadow Creek Ranch, the associated attorneys, and others engaged in a scheme to defraud her clients out of property that lawfully belonged to them. Specifically, the Racketeer Influenced and Corrupt Organizations Act ("RICO") allegation at paragraph 43, states that the "object of the enterprise is to obtain rights to Plaintiffs' interest in the plan for augmentation decreed in 80CW504 and to Plaintiffs' water supply." In addition, the allegations also included: civil conspiracy, malicious prosecution, in *quo warranto* and *ultra vires* acts, damages and injunctive relief under the Colorado Organized Crime Control Act ("COCCA"), recording false documents, conversion or trespass, fraud, breach of fiduciary duty, and civil theft.

50.     Judge Richard Matsch declined to exercise supplemental jurisdiction over the state law claims, granted the plaintiffs leave to file an amended complaint, and when they did not, Judge

Matsch dismissed the case without prejudice.

51.     Plaintiff Maynard, on behalf of the Protestors, filed a petition to set aside the final decree in Case No. 00CW99 on January 7, 2004, and in 00CW302 on July 23, 2004, pursuant to Colo. Rev. Stat. § 37-92-304(10) and Colo. R. Civ. P. 60(b). The petitions asserted that the SCRA and Lot Owners own the water rights in 80CW504.

52.     The Protestors' claims were disputed by Shadow Creek Ranch (successor in interest to Elk Dance), the other Lot Owners in Spring Creek Ranch and the Board of Directors of the SCRA.

53.     Defendants assert that the Water court dismissed the petitions to vacate the decrees based on the legal doctrine of collateral estoppel, because the 2002 Final Judgment had already concluded that the Protestors did not own the pertinent water rights.

54.     The Protestors appealed the Water court's dismissal of the petitions to the Colorado Supreme Court in Case No. 04SA328.

55.     On June 26, 2006, Justice Bender issued the opinion of the Colorado Supreme Court, which, according to Defendants, held that (a) the doctrine of issue preclusion barred claimants from arguing that they owned the disputed water and (b) claimants' failure to challenge subject matter jurisdiction of Summit County District Court barred them from collaterally attacking the court's subject matter jurisdiction.

56.     Plaintiffs allege that Defendant Justice Hobbs influenced Justice Bender's rulings improperly, with the goal of benefitting his long-time friend, Defendant Porzak, by communicating ex parte with Porzak regarding the Spring Creek Ranch cases at a water bar conference in June 2006 and at other times.

57.     Plaintiff Maynard was the subject of three disciplinary actions brought by the Office of Attorney Regulation Counsel ("OARC"): 07PDJ067, 08PDJ059 and 09PDJ028.   Defendants

claim that, in all three cases, the Disciplinary Panel concluded that Maynard had committed ethical violations.

58.     Maynard alleges that Justice Hobbs influenced the OARC to press several disciplinary charges against her to assist his friend, Porzak, because Maynard exposed Hobbs' alleged misconduct.

59.     Maynard asserts that Defendant Boog filed four grievances in November 2006 to obtain an advantage in the 03CV126 litigation.

60.     Maynard contends that she succeeded in getting one grievance, alleging she was "mentally disabled," dismissed in 2007.  She claims that Boog filed a false affidavit in support of that grievance attesting she was "paranoid."  Maynard alleges that Defendants Seekamp and Coyle of the OARC colluded with Boog in the filing of the grievance, and Defendant Gleason approved Seekamp and Coyle's activities in this regard.

61.     Maynard asserts that in June 2007, her appeal to the Colorado Supreme Court of a case involving the Animas-La Plata ("ALP") water project was dismissed because the brief was filed four days late.  Maynard claims that Defendant Justice Hobbs participated in the dismissal and the denial of her request for extension of time in violation of her rights to due process.

62.     Maynard alleges that the disciplinary action in 07PDJ067 consisted of a charge concerning her late filing of the brief in the ALP water project matter.  She claims that, although she appealed the action to the Colorado Supreme Court, the court did not decide the issues, but rather issued a one-line summary affirmation of the disciplinary hearing panel.

63.     Maynard also states that Defendant Seekamp did not respond to the issues contained in the ALP appeal, demonstrating that she knew in advance that the Colorado Supreme Court would rule for her.

64.     Maynard claims that Seekamp and Coyle colluded with Boog, Swenson and Porzak

in the filing of 08PDJ059, consisting of 14 charges, with the goal of assisting Swenson and the Andersons in 03CV126. Maynard alleges she was required to withdraw her representation of Plaintiff Lewis and Joyce McNichols in 03CV126 because Seekamp disclosed Maynard's views on the evidence and her litigation strategy to Swenson and Boog.

65.     Maynard contends that, shortly after her withdrawal, Judge Lass denied her motions for Judge Lass' recusal in 03CV126, and found Plaintiff Lewis in default and dismissed the case with prejudice for Lewis' "willful violation" of court orders. Maynard alleges that Judge Lass' findings were false and that Lewis, proceeding pro se, never had notice of the two orders he was charged with violating.

66.     Maynard alleges that she "re-entered" the litigation in 03CV126 as Lewis' attorney to seek to set aside the default and dismissal. She contends that Judge Lass denied the motion, then held a July 28, 2008 "hearing on damages" allegedly owed by Lewis to the Swenson Group, at which Judge Lass denied admission of evidence of the allegedly fraudulent liens and assessments against Lewis' property. On August 28, 2008, Judge Lass ordered that Lewis pay $209,000.00 to the Swenson Group.

67.     Plaintiffs Maynard and Lewis assert that Judge Lass was compensated for the judicial acts in connection with Spring Creek Ranch by Defendant Lane and/or his associates. They allege that Judge Lass has taken bribes from developers or defense attorneys in return for judicial acts in their favor since at least 1986.

68.     Judge Lass retired on or about August 31, 2008. Defendant Karen Romeo was appointed as a Summit County district court judge on or around September 1, 2008 to succeed Judge Lass.

69.     Maynard contends that, after she filed an appeal of Case No. 03CV126, Boog filed a motion for $139,000.00 in attorney's fees against her personally. She asserts that Judge Romeo

required her to defend against the motion for several months, holding several installments of a hearing at which Maynard was required to take the stand and submit to questioning by Boog about her litigation strategy and views on the evidence in 03CV126, even though the case never went to trial and it was dismissed due to Lewis' failure to prosecute, not any action Maynard had taken.

70.     Plaintiffs allege that, in or about December 2008, Defendant Swenson shared with Lewis that Defendant Seekamp told Swenson "the Supreme Court is going to get Maynard" and it is "tired of Maynard filing these cases and motions."

71.     Maynard claims that, because she was terrified Judge Romeo would authorize Boog to put a lien on her home, she sold it in February 2009 for $55,000.00 less than it was likely worth.

72.     Maynard asserts that the last installment of the hearing on Boog's  motion for attorney's fees was scheduled to take place in June 2009; however, the night before, Judge Romeo continued the hearing in an order stating that Maynard requested the stay to "do discovery." Maynard alleges that Judge Romeo's reason was false and that she had engaged in an ex parte communication in which she was informed that Boog had a problem attending the hearing the following day.  Maynard contends that Judge Romeo engaged in other ex parte communications regarding the case as well, either by email or telephone.

73.     Plaintiffs Maynard and Lewis claim that Judge Romeo has been promised or has received compensation from Defendant Lane or his associates in return for the use of her powers to benefit the Swenson Group or cause hardship to Maynard personally, and to complete the transfer of Lewis' property to the Swenson Group.

74.     Maynard filed for post-trial relief after the disciplinary board issued its opinion in 08PDJ059 in the spring 2009.  Maynard contends that, in responding to her motion, Defendants Coyle and Seekamp falsely informed Defendant Lucero, the presiding disciplinary judge, that she was already under suspension and failed to comply with the obligations of a suspended attorney,

although they knew Maynard was in good standing at the time. Maynard alleges Coyle and Seekamp made this false statement to keep her from filing an opening brief in the 03CV126 appeal, so to benefit Swenson and Boog.

75.    Maynard claims that she then appealed the decision in 08PDJ059 and moved for a stay under the applicable rules. She asserts Judge Lucero wrongfully denied the stay to prevent her from being able to prosecute the appeal in 03CV126.

76.    With respect to 09PDJ028, Maynard asserts that Rebecca Alexander, her opposing counsel in a lawsuit she brought on behalf of her clients, George and Patricia Barilla, against Gary Magness, filed grievances against her to gain an advantage in the litigation. Maynard claims that the OARC improperly "pushed" Alexander's grievances immediately into a public proceeding.

77.    Maynard alleges Defendant Seekamp drafted the charges in 09PDJ028 in bad faith, including a charge that required an incorrect interpretation of the word, "clients," which was later dismissed. She adds that Seekamp drafted the charges in consultation with Defendant Coyle and at the direction of Defendant Gleason.

78.    Maynard asserts that Defendant Judge Lucero ordered her to turn over her complete case file in *Barilla v. Magness* to Defendant Seekamp in violation of the discovery rules. Maynard states that she lost her temper and repossessed the file when she saw that Seekamp was copying documents from the file "in bad faith," which Maynard asserts would be useful only in developing new charges.

79.    Consequently, Judge Lucero vacated the September 2009 disciplinary hearing and ordered Maynard to show cause why she should not be sent for an independent medical examination. Maynard asserts that she prevailed in showing cause and demanded her costs, but Judge Lucero denied her request.

80.    Maynard alleges that Seekamp improperly used testimony from a former client's

grievance in approximately 2003 against her in the 09PDJ028 proceeding.  In addition, Maynard claims that Seekamp willfully misled the disciplinary hearing board by referring to ABA Standards which had no basis in the facts and applying them to offenses with which she was not charged.

81.     Maynard contends the OARC knew Magness and Alexander paid another attorney, Michael Schaefer, to give false testimony at the disciplinary hearing in 09PDJ028 in April 2010.

82.     Maynard appealed the three disciplinary actions to the supreme court in Case Nos. 08SA0281, 09SA0187, and 10SA0279, respectively.

83.     The Colorado Supreme Court affirmed the findings in Case No. 07PDJ067 and dismissed the appeal of Case No. 08PDJ059.  Defendants claim Plaintiff Maynard has not appealed these decisions to the United States Supreme Court.

84.     Plaintiff Maynard's appeal of 09PDJ028 is still pending before the Colorado Supreme Court.

85.     Maynard alleges that in January 2010, she searched her name on the internet and saw posted on a website called StateBillNews.com the word, "discipline" in red capitalized letters and a copy of the complaint in 09PDJ028.  Also posted was the hearing board's decision in 08PDJ059.  Maynard contends that the complaint was not discipline because it had not been to hearing yet and the 2008 decision was not final since it had been appealed.  Maynard also states that nothing in the postings relate to legislative bills.

86.     Maynard contends that these publications have been made to "scores" of important people in Colorado and have caused her significant harm and humiliation.

87.     Maynard claims that Defendant Knox, publisher of StateBillNews.com, said that the OARC provided him a copy of the 09PDJ028 complaint and that the OARC provides him copies of the complaints of only "some" attorneys.  Maynard asserts that after she complained of "libel per se," the postings were moved from StateBillNews.com to the "Law Week" website.

88.     Maynard alleges that the OARC and the supreme court brought disciplinary charges and imposed discipline against her, and provided Defendant Knox a copy of the 09PDJ028 complaint in retaliation for her "protected speech," which she describes as:

a.      Moving to recuse certain judges, including Justice Hobbs, exposing the judges' alleged misconduct, and criticizing the Colorado Supreme Court for disposing summarily of her appeals;

b.      Attempting to take the depositions of judges and to obtain copies of their emails to defend herself in 08PDJ059;

c.      Sending out press releases, called "Vote 'No!' on Hobbs," in which she alleged Hobbs' "misconduct" in six appeals she filed prior to Hobbs' November 2008 retention election;

d.      Posting an article on Wikipedia about her experiences in the water court and the Colorado Supreme Court in the Animas-La Plata case;

e.      Talking about election fraud in a video made by a voting rights activist concerning a case she litigated in 1998-2000 against the Town of Castle Rock; the video was posted on google video and the DVD was distributed to legislators;

f.      Posting on her website for the 2002 election (she ran for Colorado Attorney General as the Green Party candidate) statements concerning allegations of "self-dealing" in state trust lands by former Governor Roy Romer and alleged actions he and Ken Salazar took "behind the scenes" to benefit developers and polluters.

89.     In or about May 2010, Defendant Judges Roman, Miller and Jones of the Colorado Court of Appeals issued an opinion upholding Judge Lass' order dismissing certain of the Plaintiffs' claims in 03CV126.  Plaintiffs allege that the opinion mischaracterizes the facts and is "blatantly illegal" as it indicates the judges are part of a conspiracy for which they engaged in ex parte

communication requiring that Lewis' property be handed over to the Swenson Group.

90.     Plaintiffs contend that, on July 9, 2010, Defendant Judge Romeo, in the remanded case 03CV126, caused a notice to be sent to Maynard, even though the judge knew Maynard was suspended and Lewis proceeded *pro se*. Maynard told Lewis that the notice required him to call the court clerk, which he did. Thereafter, Plaintiffs allege that Judge Romeo issued an order on July 25, 2010 falsely accusing Lewis of violating court orders to "set him up" so that the judge could justifiably approve the transfer of Lewis' home and bank account to the Swenson Group.

## II.     Procedural History

Plaintiffs Alison Maynard ("Maynard") and Gerald Lewis ("Lewis") initiated the *pro se* action in 09-cv-02052-PAB-CBS on August 27, 2009. Essentially, the Complaint alleges that Defendants (including the Office of Attorney Regulation Counsel and certain of its individual members, and the Colorado Supreme Court and its individual justices) denied Plaintiffs due process and equal protection of the laws when they allegedly improperly interfered with three cases in which Maynard served as counsel by initiating disciplinary actions against Maynard and by making judgments on the disciplinary actions under conflicts of interest. Docket #1 at 1-2. More specifically, Plaintiff Lewis brought claims against Defendants for denial of due process pursuant to 42 U.S.C. § 1983 for depriving him of the ability to have Maynard serve as his counsel in an ongoing property dispute (as a result of the discipline imposed against her), resulting in default and dismissal of the case for failure to prosecute. *Id.* at 25. Lewis also claimed Defendants denied him equal protection of the laws when the Office of Attorney Regulation Counsel failed to investigate a grievance he brought against Victor Boog, but chose instead to investigate his attorney, Maynard. *Id.* at 28-29. Plaintiff Maynard brought claims against Defendants for denial of due process when she was denied discovery into the "trumped-up" grievances brought against her, which were allegedly initiated in retaliation for her protected political speech. In addition, Maynard claimed she

was denied equal protection of the laws when the Office of Attorney Regulation Counsel refused to hold her grievance in abeyance pending the resolution of Lewis' case, although the Office has previously held other attorneys' grievances in abeyance.

In response to the Complaint, on November 9, 2009, Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) identifying three disciplinary actions brought against Maynard since 2007 and asserting that the Court should abstain from reviewing the 2008 and 2009 cases because they were ongoing. Docket #64 at 6-11. In addition, Defendants argued that the United States District Court may not review the 2007 disciplinary action because it is a final decision of the Colorado Supreme Court and may be appealed only to the United States Supreme Court. *Id.* at 12. Defendants also claimed that the Eleventh Amendment bars Plaintiffs' claims against the Office of Attorney Regulation Counsel and the Colorado Supreme Court. *Id.* Moreover, Defendants claimed the individual Defendants are entitled to judicial immunity under 42 U.S.C. § 1983. *Id.* Finally, Defendants argued that Lewis' allegations for denial of due process and equal protection failed to state claims pursuant to Fed. R. Civ. P. 12(b)(6) because parties have no constitutional right to have unlicensed attorneys represent them in court proceedings, and selective enforcement is not a constitutional violation since there is a presumption that prosecutions are taken in good faith. *Id.* at 12-14.

Lewis did not respond to the Motion to Dismiss. Maynard responded on August 30, 2010 by filing a Motion to Strike the Defendants' motion claiming that it was untimely filed, that Judge Daniel erroneously determined the motion to be timely filed, that the motion is moot with the Plaintiffs' filing of a new case alleging economic damages, and that the motion will be deemed moot with the Plaintiffs' forthcoming appeal of the decision denying preliminary injunction. Docket #152 at 5.

The Motion to Dismiss was referred to the Magistrate Judge for recommendation. Docket

#126.  On November 17, 2010, this Court recommended that Plaintiffs' Motion to Strike be denied and Defendants' Motion to Dismiss be granted for lack of subject matter jurisdiction.  Docket #161. The Recommendation remained pending before the District Court at the time of Judge Kane's March 29, 2011 consolidation order. *See infra*.

Meanwhile, on May 10, 2010, Plaintiffs filed a motion to amend the Complaint to add a request for damages and several new claims and defendants.  Docket #123.  On July 14, 2010, Magistrate Judge Tafoya recommended that Plaintiff's motion be denied.  Docket #137.  That Recommendation remained pending before the District Court at the time of Judge Kane's March 29, 2011 consolidation order.[4]

On August 3, 2010, the Plaintiffs filed a new action in 10-cv-01850-WYD-KMT, for which the complaint was the same or similar to the Plaintiffs' proposed amended complaint in 09-cv-02052, and which alleges claims similar to those raised against the individual Defendants in 09-cv-02052 and new allegations against two Summit County district judges, a Garfield County water judge, three judges of the Colorado Court of Appeals, two attorneys, four individuals and two businesses.[5]  The various Defendants filed Answers and Motions to Dismiss in response to the Complaint.  The motions remained pending before District Court at the time of Judge Kane's March 29, 2011 consolidation order.

After recusals by several district and magistrate judges in the two cases, on March 23, 2011, Chief Judge Daniel reassigned the two related cases to Senior Judge Kane.  Docket #199.  On March 29, 2011, Judge Kane consolidated the cases and referred the consolidated matter in part to this

---

[4]In some respects, this Court has referred to and incorporated certain analyses from Magistrate Judge Tafoya's recommendation with her gracious permission.

[5]Plaintiffs voluntarily dismissed Chief Judge Daniel and Magistrate Judge Tafoya of the U.S. District Court, as well as Justice Bender of the Colorado Supreme Court, as Defendants in the action.  *See* dockets #7 and #95.

Court.  Docket #202.  Judge Kane ordered that the operative complaints and all pending motions in the matter be stricken and directed the parties to file status reports in anticipation of the Status Conference referred herein.[6]  *Id.*  Defendants timely filed a Joint Status Report on April 15, 2011. Docket #214.  Plaintiffs did not file a status report within the time ordered by Judge Kane; however, Plaintiffs filed a status report within the time granted by this Court.  Docket #225.  The Court found Plaintiffs' report to be noncompliant with Judge Kane's order, so directed Plaintiffs to file an amended status report on or before May 10, 2011.  Docket #226.  Instead, Plaintiffs filed a "response" to the minute order and request for clarification given the pendency of Plaintiffs' writs of prohibition and mandamus filed with the Tenth Circuit Court of Appeals.  Docket #233.

This Court held the status conference on May 11, 2011, with all parties appearing.  The Court proceeded to discuss with the Plaintiffs each claim they allege against each and every Defendant. Plaintiffs informed the Court that they rely on the allegations made in the Complaints in 09-cv-02052 and 10-cv-01850 to support their claims (Transcript of Status Conference, May 11, 2011, at 5:16-25, 6, 7: 1-12, docket #239), and they repeated the allegations for the Court in response to questions regarding each of the named Defendants.  Based upon that discussion and the entire record herein, the Court finds that Plaintiffs' allegations fail to comply with Fed. R. Civ. P. 8 and/or 9(b).

## DISCUSSION

Judge Kane referred the matter to this Court "to issue a Report after [the status] conference, in which he shall state his recommendation as to whether Plaintiffs are ready to file an Amended Consolidated Complaint."  March 29, 2011 Order, ¶ 5(c), docket #202.

---

[6]On April 6, 2011, Plaintiff Maynard filed another action in 11-cv-00901-JLK, in which she brought civil rights claims against a Denver County district judge, two attorneys and one individual. Judge Kane found, among other things, that the complaint was filed in contravention of his March 29, 2011 order, struck the complaint, terminated the action and notified Ms. Maynard that the filing subjected her to sanctions pursuant to Fed. R. Civ. P. 11.

## I.      Legal Standards

Rule 15 of the Federal Rules of Civil Procedure governs the amendment of pleadings in this Court.  *See* Fed. R. Civ. P. 15(a).  Rule 15 instructs courts to "freely give leave when justice so requires."  *Id.*  Nevertheless, denying leave to amend is proper if the proposed amendments are unduly delayed, unduly prejudicial, futile, or sought in bad faith.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

The Court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  The Court must presume that "a cause lies outside its limited jurisdiction."  *Garrett v. Stratman*, 254 F.3d 946, 951 n. 5 (10th Cir. 2001).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  The party asserting the existence of subject matter jurisdiction bears the burden of proving such jurisdiction exists.  *Montoya v. Chao*, 269 F.3d 952, 955 (10th Cir. 2002); *see also Basso*, 495 F.2d at 909.

In this case, Judge Kane, on his own motion pursuant to Fed. R. Civ. P. 12(f), struck the operative complaints in 09-cv-02052 and 10-cv-01850 for their failure to state in short and plain terms the grounds for this Court's jurisdiction and the Plaintiffs' entitlement to relief.  *See* Fed. R. Civ. P. 8(a).  A pleading which constitutes a "gross violation" of Rule 8 may be stricken.  *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 696 n. 2 (8th Cir. 1979).

"[T]he pleading standard Rule 8 [of the Federal Rules of Civil Procedure] announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173

L.Ed.2d 868 (2009) (internal quotation omitted).   The complaint must contain factual allegations that "raise a right to relief above the speculative level," or in other words, plaintiffs must "nudge [ ] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.   Where its allegations "are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations omitted).

This Court is mindful that, typically, a federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted).   However, there is every indication that Plaintiff Maynard, an attorney licensed to practice law in Colorado, has drafted all pleadings in the cases at issue.   Thus, despite the fact that they are proceeding *pro se*, the Plaintiffs are not entitled to liberal pleading interpretation due to Maynard's status as an attorney.   *See Mann v. Boatright*, 477 F.3d 1140, 1148 n. 4 (10th Cir. 2007).

## II.   Analysis

At the hearing in this matter, the Court identified each named Defendant and asked the Plaintiffs to describe with particularity the allegations against them.   *See* Hearing Transcript at 11: 2-5, docket #239.   Essentially, the Plaintiffs re-stated their allegations against Defendants as set forth in the stricken Complaints.   Here, based upon the written allegations and statements made at the status conference, the Court will analyze the Plaintiffs' proposed claims against each Defendant. Claims that may establish subject-matter jurisdiction in this Court pursuant to 28 U.S.C. § 1331 include Plaintiffs' proposed First Amendment retaliation claims and Fourteenth Amendment claims for violations of due process and equal protection pursuant to 42 U.S.C. §1983, claims for civil

conspiracy pursuant to 42 U.S.C. ¶ 1985, claims pursuant to the Clayton Act, 15 U.S.C. § 15 et seq.,

and claims pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.

§ 1961, *et seq.*

> A.   Colorado Supreme Court and Office of Attorney Regulation Counsel

Absent an unmistakable waiver by a state of its Eleventh Amendment immunity, or an

unmistakable abrogation of such immunity by Congress, the Eleventh Amendment provides absolute

immunity from suit in federal courts for states and their agencies. *Blatchford v. Native Village of*

*Noatak & Circle Village,* 501 U.S. 775, 785-86 (1991).

The Supreme Court has recognized an exception to the Eleventh Amendment for such

actions where a plaintiff is seeking prospective enforcement of their federal rights. *See Ex parte*

*Young,* 209 U.S. 123, 159-60 (1908). In *Young,* the Supreme Court held that the Eleventh

Amendment "generally will not operate to bar suits so long as they (i) seek only declaratory and

injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are

aimed against state officers acting in their official capacities, rather than against the State itself."

*Hill v. Kemp,* 478 F.3d 1236, 1255-56 (10th Cir. 2007); *see also Buchwald v. University of New*

*Mexico Sch. of Med.,* 159 F.3d 487, 495 (10th Cir. 1998) (*Young* makes it clear that this exception

"may not be used to obtain a declaration that a state officer has violated a plaintiff's federal rights

in the past" or as a means for seeking money damages) (citations and quotations omitted).

Here, in Case No. 09-cv-02052, Plaintiffs attempt to bring claims for monetary and

injunctive relief against both the Colorado Supreme Court and the Colorado Office of Attorney

Regulation Counsel. As state agencies, these entities are immune from suit in federal court for all

claims, including those for prospective injunctive relief. *See Hill*, 478 F.3d at 1255. Therefore,

because these claims are subject to dismissal for lack of jurisdiction and, therefore, futile, the Court

recommends that the Plaintiffs be denied permission to bring claims for monetary and injunctive

relief against the Colorado Supreme Court and the Colorado Office of Attorney Regulation Counsel.

B.      Judicial Officers

In Case No. 09-cv-02052, Plaintiffs seek to bring claims for declaratory and injunctive relief against Justices Mullarkey, Rice, Coats, Martinez, Eid and Hobbs of the Colorado Supreme Court, and in Case No. 10-cv-01850, claims for damages and injunctive relief against Justices Mullarkey and Hobbs, Judge Lucero, presiding disciplinary judge of the Colorado Supreme Court, Judges Roman, Jones, and Miller of the Colorado Court of Appeals, Judges Lass and Romeo of the Summit County District Court, and Judge Ossola of the Garfield County District Court (hereinafter, "Judicial Officers").

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." *Pierson v. Ray,* 386 U.S. 547, 553–54 (1967). "Absolute immunity is . . . necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." *Butz v. Economou*, 438 U.S. 478, 512 (1978). Judicial immunity "applies even when the judge is accused of acting maliciously or corruptly" as judicial immunity acts for "'the benefit of the public, whose interest it is that judges should be at liberty to exercise their functions with independence and without fear of consequence.'" *Pierson,* 386 U.S. at 554 (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 349 n.16 (1871)).

Federal courts "have proceeded on the assumption that common-law principles of legislative and judicial immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so." *Pulliam v. Allen*, 466 U.S. 522, 529 (1984). Thus, judicial immunity extends to claims of violations of constitutional rights under 42 U.S.C. § 1983, *Stump v. Sparkman,* 435 U.S. 349, 356 (1978), conspiracy claims under 42 U.S.C. § 1985, *Van Sickle v. Holloway,* 791 F.2d 1431, 1434 (10th Cir. 1986), and claims under the Racketeer

Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, *Simms v. Gibson*, 168 F. App'x 860, 861 (10th Cir. 2006) (citing *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)) (court found that state court judge accused of conduct underlying a RICO claim absolutely immune); *see also Dopp v. Loring*, 54 F. App'x 296, 298 (10th Cir. 2002) (same).

A judge will lose absolute immunity from a suit for damages only for (1) "nonjudicial actions, i.e., actions not taken in the judge's judicial capacity" or (2) judicial actions "taken in the complete absence of all jurisdiction." *Mireles v. Waco,* 502 U.S. 9, 11-12 (1991). "The factor determining whether an act by a judge is a 'judicial' one relates to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they deal with the judge in his judicial capacity." *Stump*, 435 U.S. at 362.

"It is well established that '[a]bsolute immunity bars suits for money damages for acts made in the exercise of prosecutorial or judicial discretion.'" *Andrews v. Heaton*, 483 F.3d 1070, 1076 (10th Cir. 2007) (quoting *Guttman v. Khalsa*, 446 F.3d 1027, 1033 (10th Cir. 2006)). Section 309(c) of the Federal Courts Improvement Act of 1996 ("FCIA") bars injunctive relief in any § 1983 action "against a judicial officer for an act or omission taken in such officer's judicial capacity ... unless a declaratory decree was violated or declaratory relief was unavailable." *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 n.6 (10th Cir. 2008) (quoting the section of the FCIA incorporated into 42 U.S.C. § 1983). Thus, the doctrine of judicial immunity extends to suits against judges where a plaintiff seeks both monetary and injunctive relief. *Id.* (citing *Roth v. King*, 449 F.3d 1272, 1286 (D.C. Cir. 2006), *cert. denied sub nom*, *Sitomer v. King*, 549 U.S. 1210 (2007)).

In 09-cv-02052, Plaintiffs seek both injunctive and declaratory relief from claims raised against the Judicial Officers. "A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." *Id.*; *see also Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991) (a plaintiff cannot

maintain a § 1983 action for declaratory or injunctive relief unless he or she can demonstrate a good chance of being likewise injured in the future).

In 09-cv-02052, Plaintiffs seek declaratory relief only for past acts: (1) "I am entitled to declaratory and injunctive relief as to both questions [whether the disciplinary proceedings violated the Supremacy Clause and the doctrine of res judicata], vacating the discipline imposed against me in 08 PDJ 059 for filing the RICO case"; and (2) "I (or my clients, or both) am entitled to declaratory relief adjudging that this constitutional right [denial of appeal] was violated, and either prohibitory or mandatory injunctive relief, as applicable, vacating and voiding any decision in which such consideration was absent." Docket #1 at 36-37, ¶¶ 124, 125. Such requests for declaratory relief are not justiciable. *Lawrence*, 271 F. App'x at 766.

With respect to their claims for injunctive relief in 09-cv-02052, Plaintiffs claim that Justice Bender "ruled on [only] one of [four] arguments, and in a way contrary to all precedent" in 04SA328 (Complaint, ¶ 20), and upheld a trial court's sanction of attorney's fees against Maynard in 05SA326 (*id.* at ¶ 32). Plaintiffs allege Justice Hobbs, during oral argument in 04SA328, had been "openly hostile to [Maynard] and asked the other side whether it was seeking attorney fees" (Complaint, ¶ 22). Maynard claims Justice Hobbs was friends with opposing counsel, Glenn Porzak ([*id.* at ¶ 26), and was present with him at a bar conference while the appeal in 04SA328 was pending (*id.* at ¶ 23); Hobbs and Porzak engaged in ex parte communications about the case (*id.* at ¶ 25); and Hobbs then influenced Justice Bender in the writing of the decision in 04SA328 (*id.* at ¶ 27). Additionally, Plaintiffs assert Justice Hobbs participated in orders in 06SA388 granting no further extension to file a "diligence" brief and dismissing the appeal, and in an order in 07SA100 granting time to amend the notice of appeal (Complaint, ¶¶ 48, 52). Plaintiffs allege Justice Eid also participated in both appeals, although her husband, Troy Eid, was a party to the cases (Complaint, ¶ 49). Finally, Plaintiffs contend Justice Mullarkey denied Maynard's motion to recuse Justices Hobbs and Eid

(Complaint, ¶ 54).

In 10-cv-02052, Plaintiffs seek damages and injunctive relief making the same or similar allegations against Justice Hobbs.  In addition, Plaintiffs allege that the Colorado Court of Appeals Judges Roman, Jones, and Miller rendered an "illegal" decision in dismissing for failure to prosecute. (Complaint, ¶¶ 77, 113, 128.) Further, Plaintiffs allege that Judge Ossola "never decided [ ] issues--which were jurisdictional," granted a motion for a "$20,000 attorney fee sanction" against Plaintiff Maynard, and "refuse[d] to rule on allegations Maynard brought to him in good faith." (*Id.* ¶¶ 74-75, 191, 197.) Judge Romeo allegedly "required [Maynard] to defend" against a "frivolous" motion for attorney fees, continued a hearing on the attorney fees, and refused to consider a dismissal and default, all in a manner allegedly contrary to law. (*Id.* ¶¶ 57-59.) Judge Lass ordered changes to the SCRA bylaws, approved the new SCRA Board, directed the homeowners to sign the amendments, denied Maynard's motion for recusal, ordered Maynard to pay $209,000.00 in attorney's fees, and dismissed Plaintiff Lewis' case for failure to prosecute, allegedly resulting in various losses to Lewis. (*Id.* ¶¶ 21-24, 66-68, 110.)  And, Justice Mullarkey allegedly denied Maynard's discovery request for Justice Hobbs' emails. (*Id.* ¶¶ 133, 172.)

It appears from these allegations that Plaintiffs simply disagree with the Judicial Officers' rulings and decisions, each of which constitute judicial acts that are normally performed by a judge and each during which the Plaintiffs dealt with the Judicial Officers in their judicial capacities. *See Mireles,* 502 U.S. at 11-12.  Plaintiffs do not allege that any of the above actions were taken in the complete absence of all jurisdiction; therefore, the Court recommends finding that the Judicial Officers are entitled to absolute judicial immunity for these actions. *Id.*

While the Plaintiffs allege that Judge Lass "lacked jurisdiction . . . and knew he lacked jurisdiction" in taking a number of judicial acts in a Colorado state case involving Plaintiff Lewis (*see* Complaint, ¶ 28), "the scope of the judge's jurisdiction must be construed broadly where the

issue is the immunity of the judge." *Stump*, 435 U.S. at 356. A judge does not lose immunity for

acts that were "merely 'in excess of his jurisdiction.'" *Lerwill v. Joslin,* 712 F.2d 435, 439 (10th Cir.

1983); *see also Stump*, 435 U.S. at 356-57 ("A judge will not be deprived of immunity because the

action he took was in error, was done maliciously, or was in excess of his authority; rather, he will

be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'"). Rather, a

judge only relinquishes absolute immunity where he acts "clearly without any colorable claim of

jurisdiction." *Snell v. Tunnell,* 920 F.2d 673, 686 (10th Cir. 1990) (internal citations omitted); *see*

*also Duty v. City of Springdale, Ark.*, 42 F.3d 460, 462 (8th Cir. 1994) (a court acts in excess of

jurisdiction if the act "is within [his] general power of jurisdiction but is not authorized because of

certain circumstances"). That is, a judge is absolutely immune for judicial acts "for which the judge

has at least a semblance of jurisdiction." *Lerwill*, 712 F.2d at 438.

Plaintiffs' allegation concerning Judge Lass is made without any factual support and, thus,

is merely conclusory and insufficient to overcome the fact that Judge Lass, a Colorado state district

court judge at the time of the allegations at issue, had general jurisdiction over civil matters. In

Colorado, "[t]he district courts shall be trial courts of record with general jurisdiction, and shall have

original jurisdiction in all civil, probate and criminal case, except as other provided herein [referring

to probate court], and shall have such appellate jurisdiction as may be prescribed by law." Colo.

Const. art. VI, § 9(1). Thus, even assuming for the purpose of this analysis that Judge Lass did not

have jurisdiction to take the specific acts alleged, he had general jurisdiction as to the case,

03CV126, over which he presided. *See Stump*, 435 U.S. at 359-60 (finding that an Indiana Circuit

Court Judge had general jurisdiction to grant a petition filed in that court authorizing the sterilization

of a minor child with a developmental disability); *Duty,* 42 F.3d at 462-63 (suggesting that a clear

absence of jurisdiction might exist where a court of limited jurisdiction adjudicates a case clearly

outside its jurisdiction, "such as when a probate court conducts a criminal trial"). In this regard, the

Court finds that Plaintiffs have failed to sufficiently allege that Judge Lass acted in the clear absence of all jurisdiction. Consequently, the Court recommends finding that Judge Lass would be entitled to absolute judicial immunity as to Plaintiffs' proposed claims.

Plaintiffs also allege that several Judicial Officers communicated *ex parte* with parties or other individuals (Complaint, ¶¶ 61, 68, 77, 118-119), engaged in a conspiracy against Plaintiffs (*id.* ¶¶ 71, 77, 144-145), or accepted bribes in exchange for judicial acts (*id* ¶¶ 54-55, 62, 80). "Judges enjoy absolute immunity from liability under § 1983 – even when the judge allegedly conspires with private parties." *Hunt v. Bennett,* 17 F.3d 1263, 1267 (10th Cir. 1994) (citing *Dennis v. Sparks,* 449 U.S. 24, 28-32 (1980)). Also, allegations that a judge has performed judicial acts pursuant to a bribe are not sufficient to overcome immunity. *Holloway v. Walker,* 765 F.2d 517, 522 (5th Cir. 1985) ("where a judge's absolute immunity would protect him from liability for the performance of particular acts, mere allegations that he performed those acts pursuant to a bribe or conspiracy will not be sufficient to avoid the immunity") (citing *Sparks v. Duval Ranch Co.,* 604 F.2d 976 (5th Cir. 1979) (en banc), *aff'd sub nom., Sparks,* 449 U.S. 24 (1980)). Similarly, a judicial officer's *ex parte* communications do not abrogate a judicial officer's absolute judicial immunity. *Crudup v. Schulte,* 12 F. App'x 682, 686 n.3 (10th Cir. 2001) (allegations that a judge conducted an ex parte meeting with the prosecuting attorney were not sufficient to overcome absolute immunity).

Further, Judge Lucero, as the presiding judge over Maynard's disciplinary proceedings, is also entitled to judicial immunity. Plaintiffs' allegations against Judge Lucero relate to actions taken in his role as the presiding disciplinary judge, including that he required Maynard to turn over her case file, vacated a hearing, denied Maynard her costs at a show-cause hearing, and refused to grant a stay of the disciplinary proceedings pending an appeal, in violation of applicable procedural rules. (*See* Complaint, ¶¶ 6, 91-93, 155, 164.) Plaintiffs further allege that Judge Lucero issued a disciplinary opinion that "faulted [Maynard] for nothing less than the exercising of [her] First

Amendment rights." (*Id.* ¶ 168.) And finally, Plaintiffs allege that Judge Lucero substituted his judgment for that of a federal judge in violation of the doctrine of *res judicata* and the Supremacy Clause of the United States. (*Id.* ¶¶ 139, 169).

Individuals who adjudicate disciplinary proceedings engage in work that is "'functionally comparable' to that performed by judges and prosecutors." *Verner v. State of Colorado,* 533 F. Supp. 1109, 1115 (D. Colo. 1982), *aff'd,* 716 F.2d 1352 (10th Cir. 1982) (citing *Simons v. Bellinger,* 643 F.2d 774, 777 (D.C. Cir. 1980)). Plaintiffs' allegations against Judge Lucero clearly refer to judicial acts taken by him pursuant to his authority as the presiding disciplinary judge over Maynard's disciplinary proceedings. Thus, this Court recommends finding that Judge Lucero is entitled to absolute judicial immunity.

In summary, the Judicial Officers – more specifically, Eid, Mullarkey, Hobbs, Roman, Jones, Miller, Lucero, Lass, Romeo, and Ossola[7] – are all entitled to judicial immunity because their alleged actions constitute judicial acts for which they had at least some semblance of jurisdiction. *See Lerwill,* 712 F.2d at 438. Consequently, due to the futility of potential claims against these Defendants based upon the Plaintiffs' stated allegations, the Court recommends that the Plaintiffs be denied permission to bring claims for monetary, declaratory and injunctive relief against the Judicial Officials.

C.      OARC Officials

In Case No. 09-cv-02052, Plaintiffs seek to bring claims for injunctive and declaratory relief against April Seekamp (McMurrey), John Gleason and James Coyle, all employees of the Office of Attorney Regulation Counsel of the Colorado Supreme Court. In Case No. 10-cv-01850, Plaintiffs

---

[7]The Court notes that Plaintiffs have failed to allege any factual allegations specifically against Justices Coats, Rice and Martinez in contravention of Fed. R. Civ. P. 8(a); thus, the Court recommends that Plaintiffs be denied permission to raise claims against the justices in this action.

seek to renew such claims and to add claims for monetary damages against each official.[8]

### 1.    Claims for Monetary Damages

Prosecutors enjoy absolute immunity from civil suits for damages asserted against them for actions taken "in initiating a prosecution and in presenting the State's case." *Imbler v. Pachtman,* 424 U.S. 409, 431 (1976); *see also Meade v. Grubbs*, 841 F.2d 1512, 1532 (10th Cir. 1988).  The question of whether a prosecutor is entitled to absolute immunity for his actions depends on the nature of the function performed by the prosecutor at the time of the alleged misconduct. *Buckley v. Fitzsimmons,* 509 U.S. 259, 271 (1993).  Actions taken as an advocate or, more specifically, "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State" support absolute immunity.  *Id.* at 273.  However, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.*  Instead, prosecutors performing these acts enjoy only qualified immunity.  *Id*.  If prosecutorial immunity does attach, it is absolute and, therefore, applies to cases of malicious or bad faith prosecution, *Imbler,* 424 U.S. at 437, even if it is obvious "to the prosecutor that he is acting unconstitutionally and thus beyond his authority." *Lerwill,* 712 F.2d at 437-38.

The Tenth Circuit has extended prosecutorial immunity to officials charged with pursuing attorney discipline.  *See Stein v. Disciplinary Bd. of Supreme Court of N.M.,* 520 F.3d 1183, 1193 (10th Cir. 2008).  Initially, the Tenth Circuit construed the immunity of attorney discipline counsel broadly, holding that prosecutorial immunity extends to "bar officials charged with the duties of investigating, drawing up, and presenting cases involving attorney discipline." *See Clulow v.*

---

[8]Because Plaintiffs' allegations concerning the OARC Officials are renewed in the 10-cv-01850 Complaint, the Court's references to "Complaint" relate to that filed in 10-cv-01850.

*Oklahoma,* 700 F.2d 1291, 1298 (10th Cir. 1983), *overruled in part on other grounds*, *Garcia v. Wilson*, 731 F.2d 640 (10th Cir. 1984), *aff'd*, 471 U.S. 261 (1985).  However, in *Stein,* the Tenth Circuit acknowledged "*Clulow*'s language indicating that absolute immunity extends to disciplinary officials' investigative functions appears to conflict with later Supreme Court precedent that grants only qualified immunity to the investigative activities of prosecutors."  520 F.3d at 1193 (citing *Burns v. Reed,* 500 U.S. 478, 495 (1991)).  Nonetheless, because the plaintiff's allegations in *Stein* related only to prosecutorial, rather than investigative, functions, the court ultimately left any potential conflict between *Clulow*'s dictum and subsequent Supreme Court precedent for another day.  *Id.* at 1193-94.

According to *Stein*, attorney discipline counsel's actions taken in "preparation for trial in the role of advocate are protected by absolute immunity."  *Id.* at 1194 (citing *Buckley,* 509 U.S. at 273 (2009)).  "One such protected act is the decision to prosecute."  *Id.* at 1193 (citing *Imbler,* 424 U.S. at 431).  In fact, "[d]eciding whether to bring charges . . . is a quintessential prosecutorial function protected by absolute immunity."  *Id.* at 1194 (citing *Buckley,* 509 U.S. at 273)).  Thus, "any failure-to-investigate claim against disciplinary counsel amounts to a claim that they should not have exercised their discretion to bring charges without obtaining more information ... [a]gainst such a claim, counsel are protected by absolute immunity."  *Id.*

Here, to the extent that Plaintiffs allege the OARC Officials maliciously prosecuted Maynard, the Court finds the OARC Officials absolutely immune.  More specifically, Plaintiffs allege repeatedly that the OARC Officials brought "frivolous" or "groundless" attorney discipline proceedings against Maynard.  (*See, e.g.*, Compl. ¶¶ 48, 49, 86-87, 112, 142.)  Further, Plaintiffs allege that the OARC Officials failed to pursue attorney discipline against other attorneys, even when it was clearly warranted.  (*Id.* ¶¶ 125, 158, 160-162.)  For instance, Plaintiffs allege that the OARC Officials' "selective prosecution" of Maynard evince a "plan" or conspiracy against

Maynard. (*Id.* ¶¶ 48-49, 71, 85, 89, 115-116, 121.)  Plaintiffs also allege that the OARC Officials violated their own policy by bringing disciplinary proceedings before the conclusion of the underlying lawsuit in which Maynard was alleged to have acted wrongfully. (*Id.* ¶¶110, 112, 115, 153-154, 156.)  Further, Plaintiffs allege that in one of Maynard's disciplinary proceedings, the OARC Officials sought the sanction of Maynard's disbarment. (*Id.* ¶ 96.)  Each of these allegations seek to assign liability for the OARC Officials' decision to prosecute.  As such, this Court recommends finding that the OARC Officials would be entitled to absolute prosecutorial immunity from any liability raised in these allegations.

Plaintiffs also assert allegations that, while not relating to the OARC's decision to prosecute, would nonetheless assign liability to the OARC Officials' actions as advocates for the State of Colorado in presenting Maynard's disciplinary charges.  Specifically, Plaintiffs allege that the OARC Officials lied to the presiding disciplinary judge and included false statements in their briefs (Complaint, ¶ 64-65), contravened an OARC policy by providing the underlying disciplinary complaint in order to influence a witness before her deposition (*id.* ¶ 150), and even condoned witnesses being paid for their testimony (*id.* ¶ 89).  However, because these alleged actions were taken in the OARC Officials' roles as advocates for Colorado, and are otherwise associated with the judicial phase of a prosecution, such actions fall within the purview of absolute prosecutorial immunity. *See Schrob v. Catterson*, 948 F.2d 1402, 1417 (3d Cir. 1991) (finding that even if prosecutor told judge a "bald faced lie" in applying for a seizure warrant, prosecutor was absolutely immune); *Cohen v. Oasin,* 863 F. Supp. 225, 229 (E.D. Pa. 1994) (government counsel who allegedly made false statements to administrative tribunal entitled to prosecutorial immunity); *Stokes v. City of Chicago,* 660 F. Supp. 1459, 1461 (N.D. Ill. 1987) (prosecutor who allegedly influenced prospective witnesses by paying them for their testimony entitled to prosecutorial immunity). Accordingly, this Court recommends finding that the OARC Officials would be entitled to absolute

prosecutorial immunity as to these allegations.

Plaintiffs allege that Defendant Seekamp "was copying documents [from Maynard's case file] in bad faith, which would be useful only in trumping up new charges." (Complaint, ¶ 91.) Such conduct may be construed as investigatory and, therefore, not taken in Seekamp's prosecutorial capacity. As outlined above, a prosecutor is not entitled to absolute prosecutorial immunity for actions taken in his or her investigatory function; instead, such acts are entitled only to qualified immunity. *Imbler*, 424 U.S. at 430-31. However, the Tenth Circuit has "recognized that absolute immunity may attach even to such administrative or investigative activities 'when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.'" *Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1490 (10th Cir. 1991) (quoting *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990)). Moreover, "it is equally clear that advocacy is not limited to . . . arguing in the courtroom." *Mink v. Suthers,* 482 F.3d 1244, 1261 (10th Cir. 2007).

Nevertheless, to qualify for absolute immunity, "an action must be 'closely associated with the judicial process.'" *Mink*, 482 F.3d at 1260 (quoting *Burns*, 500 U.S. at 495). Although Plaintiffs may characterize Seekamp's actions as investigatory in that she allegedly sought to obtain evidence to support future disciplinary charges against Maynard, Plaintiffs' allegations clearly demonstrate that Seekamp was participating in discovery to prepare her case against Maynard for hearing. The discovery process is part and parcel of the judicial process. *See Burns*, 500 U.S. at 495; *see also Bernard v. County of Suffolk,* 356 F.3d 495, 498 (2d Cir. 2004) ("as long as prosecutor acts with colorable authority, absolute immunity shields his performance of advocate functions regardless of the motivation"). Therefore, because Seekamp's alleged actions in the discovery process may be construed as necessary to fulfill her function as an officer of the court, this Court recommends finding that Seekamp would be entitled to absolute immunity from liability raised in these allegations.

Not all of Plaintiffs' allegations against the OARC Officials relate to actions taken within the judicial process. First, Plaintiffs allege that Seekamp made statements to Robert Swenson, which he reconveyed to Plaintiff Lewis in or around December of 2008, that "'the Supreme Court is going to get Maynard' and that it is 'tired of Maynard filing these cases and motions.'" (Complaint, ¶ 63.) However, Plaintiffs' allegation is devoid of any factual averments as to when or whether Seekamp actually made any such statement to Swenson.[9] *See Iqbal,* 129 S. Ct. at 1949 (a complaint does not suffice if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement'"). More importantly, Plaintiffs' allegation is used only to provide circumstantial evidence that Defendants conspired to bring disciplinary proceedings against Maynard for political reasons, but has itself no independent legal significance. (*See* Complaint, ¶ 163.) As described herein, Seekamp should be absolutely immune against allegations that she and the other OARC Officials maliciously prosecuted Maynard.

Second, Plaintiffs allege that the OARC defamed Maynard by providing to a third party one of the disciplinary complaints brought against Maynard. The third party featured the complaint in an online article under the title of "DISCIPLINE!" (Complaint, ¶¶ 101-104.) Based on this allegation, Plaintiffs claim that the OARC Officials defamed Maynard because the underlying case had not yet reached a hearing and, therefore, featuring the complaint under the caption "DISCIPLINE!" was false. (*Id.* ¶¶ 176-181.)

When holding a press conference and making comments to the media, a prosecutor or other state attorney is not entitled to absolute immunity, but only qualified immunity. *Joseph v. Yocum,* 53 F. App'x 1, 3 (10th Cir. 2002) (citing *Buckley,* 509 U.S. at 277-78). "Qualified immunity shields a government official from liability so long as his [or her] actions do not violate clearly established

_____

[9]Notably, when this Court asked Mr. Lewis during the status conference about the source of these comments, Mr. Lewis stated that Swenson said "somebody told him" about the alleged comments, but "didn't say who." Conference Transcript, 14: 3-16, docket #239.

federal statutory or constitutional rights of which a reasonable person would have known." *Id.* (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also McFall v. Bednar,* 407 F.3d 1081, 1087 (10th Cir. 2005). Maynard alleges that the OARC Officials "caused the publication of defamatory material" about her, which resulted in "enormous and irreparable damage to [her] reputation, career, and ability to earn [a] living," and has caused her "severe mental anguish, humiliation, pain and suffering." (Complaint, ¶ 176, ¶ 181.[10]) However, standing alone, Plaintiffs' allegations fail to state any constitutional violation. *See McGhee v. Draper,* 639 F.2d 639, 643 (10th Cir. 1981) (stating that "stigmatization or reputational damage alone, no matter how egregious, is not sufficient to support a § 1983 cause of action"); *cf. Arnold v. McClain,* 926 F.2d 963, 968 (10th Cir. 1991) (holding that governmental employee must show publication of false and defamatory information in connection with job termination in order to establish claim of liberty interest violation).

Moreover, the OARC Officials are entitled to qualified immunity to the extent the Plaintiffs allege that the OARC's publishing of a disciplinary complaint under the heading "DISCIPLINE!" and a non-final version of an opinion from one of the disciplinary proceedings amounted to a violation of Maynard's constitutional right to equal protection. (*See* Complaint, ¶¶ 158-159.) This Court has found no case establishing that such conduct amounts to a violation of equal protection. *See Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992), *overruled in part on other grounds*, *Williams v. City & Cnty. of Denver*, 99 F.3d 1009, 1014-15 (10th Cir. 1996) (for law to be clearly established for purposes of qualified immunity, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains").

---

[10]According to the Complaint, these allegations support state law claims for "defamation" and "intentional infliction of emotional distress." *Id.*

In sum, the Court finds that the OARC Officials would be entitled either to absolute prosecutorial immunity from liability underlying Plaintiffs' allegations, or qualified immunity because Plaintiffs fail to allege any constitutional violation or demonstrate clearly established law. Consequently, the Court recommends that the Plaintiffs be denied permission to bring claims for monetary relief based upon their stated allegations against the OARC Officials.

2.      Claims for Declaratory and Injunctive Relief

A plaintiff may seek prospective injunctive relief despite a defendant's valid defense of prosecutorial immunity. *Lemmons v. Law Firm of Morris & Morris*, 39 F.3d 264, 267 (10th Cir. 1994) ("[a] plaintiff may ... seek injunctive relief to guard against continuing (or future) governmental misconduct."); *see also Wilson v. Stocker*, 819 F.2d 943, 950 (10th Cir. 1987) (citing *Supreme Court of Va. v. Consumers Union of the United States, Inc.*, 446 U.S. 719 (1980) ("although prosecutors are absolutely immune from damage awards, they are subject to suits for injunctive relief")).   However, a plaintiff seeking declaratory and/or injunctive relief must allege that he will face misconduct in the future. *Van Deelan v. City of Eudora*, 53 F. Supp. 2d 1223, 1235 (D. Kan. 1999) (citing *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1498 n.14 (10th Cir. 1995)); *see also Martinez v. Winner*, 771 F.2d 424, 438-39 (10th Cir. 1985) (injunctive relief against prosecutorial defendants who were no longer in office would be moot; however, an injunction could be entered against the successor U.S. Attorney in his or her official capacity for the purpose of controlling and preventing future prosecutorial actions in violation of plaintiff's constitutional rights).

Here, it must be noted that Plaintiffs, in 10-cv-01850, bring their claims against Defendants specifically in the Defendants' *individual* capacities.   However, the case law in the Tenth Circuit seems to require that claims for prospective injunctive relief for violation of constitutional rights be brought against state officers in their *official* capacities. *See, e.g., Osage Nation v. Oklahoma ex rel.*

*Oklahoma Tax Comm'n,*, 260 F. App'x 13, 17 (10th Cir. 2007) ("under *Ex Parte Young*, 209 U.S. 123 (1908), a party may sue individual state officers in federal court in their official capacities for prospective injunctive relief"); *Hill v. Kemp*, 478 F.3d 1236, 1255-56 (10th Cir. 2007) (the Eleventh Amendment will not bar operate to bar suits so long as they seek only declaratory and injunctive relief and are aimed against state officers acing in their official capacities)). Nevertheless, to ensure a thorough evaluation of all of Plaintiffs' potential claims and to the extent the Plaintiffs may seek declaratory and injunctive relief against the individual Defendant officials, the Court will proceed with its analysis.

Under their Fifth Claim for Relief, Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201 and "prohibitive and mandatory injunctive relief." (Complaint at 36.) Specifically, Plaintiffs claim entitlement to declaratory and injunctive relief as to "laws violated and to an order vacating the discipline imposed against [Maynard] in 08 PDJ 059 and 07 PDJ 067." (*Id.*, ¶ 170.) In addition, Plaintiffs seek declaratory relief that their "constitutional right of appellate review was violated" and mandatory injunctive relief "vacating any decision in which [appellate] consideration was absent." (*Id.*, ¶ 171.) Further, Plaintiffs seek "prohibitory injunctive relief enjoining the hearing board in 09 PDJ 028 for violation of the OARC's policies requiring decision by a court, first, before disciplining an attorney for a civil matter." (*Id.*) Finally, Plaintiffs seek declarations that the confidentiality attending Plaintiffs' Exhibit 13, submitted under seal during the preliminary injunction hearing in this matter, as well as attending certain materials from a judge's application file, is null and void in violation of the First Amendment. (*Id.*, ¶¶ 172-173.)

Clearly, any claim for retrospective declaratory or injunctive relief, such as the Plaintiffs' claims for injunctions "as to laws violated" or to vacate past disciplinary actions or decisions rendered, and for declarations that Plaintiffs' constitutional rights were violated, are not justiciable. *Lawrence*, 271 F. App'x at 766. However, Plaintiffs' request for injunctive relief to enjoin an

ongoing alleged unconstitutional act may be possibly adjudicated. Therefore, the Court will proceed with its inquiry as to certain of Plaintiffs' requests.

       1.       Request to Enjoin Proceedings in 09 PDJ 028

First, it appears from Plaintiffs' allegations that the disciplinary action taken against Maynard in 2009 is an ongoing proceeding (currently pending before the Colorado Supreme Court), a review from which this Court should abstain pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).

*Younger* abstention is jurisdictional. *D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1228 (10th Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 100 n. 3 (1998)). Courts properly address the doctrine at the outset because it "neither provides a basis for nor destroys federal jurisdiction, [but] it does determine when the federal courts must refrain from exercising jurisdiction." *Chapman v. Barcus*, 372 F. App'x 899, 901 n.1 (10th Cir. Apr. 13, 2010) (quoting *Canatella v. California*, 404 F.3d 1106, 1113 (9th Cir. 2005)). Indeed, a Court has no power to decide an issue if it lacks jurisdiction. *Steel Co.* 523 U.S. at 94, 101-02.

The *Younger* abstention doctrine, if applied, obligates the Court to dismiss an action in favor of an ongoing state proceeding. *Weitzel v. Div. of Occupational & Prof'l Licensing*, 240 F.3d 871, 875 (10th Cir. 2001) ("'*Younger* abstention is non-discretionary'; the district court must abstain once the conditions are met, 'absent extraordinary circumstances'") (quoting *Amanatullah v. Colorado Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir. 1999)). According to the Supreme Court, federal courts are to avoid interference with ongoing state proceedings if the state court provides an adequate forum to present any federal constitutional challenges. *Younger*, 401 U.S. at 45, 49.

Pursuant to the *Younger* abstention doctrine, "[e]ven when a federal court would otherwise have jurisdiction to hear a claim, the court may be obliged to abstain when a federal court judgment on the claim would interfere with an ongoing state proceeding implicating important state interests." *Unified Sch. Dist. No. 497*, 392 F.3d at 1227-28. If a party is seeking equitable relief, the Court may

dismiss the suit under abstention principles "because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 718, 721 (1996) (quoting *Railroad Com. of Texas v. Pullman Co.*, 312 U.S. 496, 501 (1941) (citation omitted)).

> This Court must abstain from exercising jurisdiction if the following conditions are met:
>
> (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.

*Weitzel*, 240 F.3d at 875.

In this case, Defendants raised the *Younger* abstention doctrine in response to Plaintiffs' motion for preliminary injunction, which was heard by Judge Brimmer in case no. 09-cv-02052 on September 8, 2009. *See* Transcript of Hearing on Motion for Preliminary Injunction, September 8, 2009, docket #35. After hearing the evidence, Judge Brimmer ruled not only that the 2008 (at the time) and 2009 proceedings were ongoing, that Plaintiffs had the opportunity to raise constitutional challenges during such proceedings, and that the disciplinary proceedings involve important state interests, but also that the Plaintiffs failed to demonstrate "extraordinary circumstances" (harassment or bad faith) overcoming the mandate to abstain if all *Weitzel* conditions are met. *Id.* at 17: 17-25, 18: 1-6. Judge Brimmer denied the motion for preliminary injunction concluding that the court must abstain pursuant to *Younger*. *Id.* at 18: 6-11.

This Court sees no reason to diverge from Judge Brimmer's ruling, considering that the proceedings in 09 PDJ 028 remain ongoing. *See Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) ("[t]he standard [for permanent injunction] is remarkably similar to the standard for a preliminary injunction. The only measurable difference between the two is that a permanent injunction requires showing *actual* success on the merits, whereas a preliminary

injunction requires showing a *substantial likelihood* of success on the merits.") (emphasis added).

Thus, the Court recommends that the District Court find it would abstain from deciding Plaintiffs'

potential claims for injunctive and declaratory relief concerning the disciplinary action in 09 PDJ

028, which is an ongoing state proceeding.

2.      Proceedings in 08 PDJ 059 and 07 PDJ 067

In addition, although this Court has already determined that Plaintiffs may not seek

retrospective injunctive relief here, the Court also finds that it may not review or vacate the

decisions in disciplinary actions, 07 PDJ 067 or 08 PDJ 059 pursuant to the *Rooker-Feldman*

doctrine.  To the extent that the Colorado Supreme Court has entered final judgments in 07PDJ067

and 08 PDJ 059, the Plaintiffs must seek review in the United States Supreme Court.

The *Rooker-Feldman* doctrine is a jurisdictional prohibition that is based on 28 U.S.C. §

1257, which holds that federal review of state court judgments may be obtained only in the United

States Supreme Court.  *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia

Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *see also Johnson v. DeGrandy*, 512 U.S. 997,

1005-06 (1994) (holding that the *Rooker-Feldman* doctrine bars "what in substance would be

appellate review of the state judgment in a United States district court, based on [a] claim that the

state judgment itself violates . . . federal rights").  The *Rooker-Feldman* doctrine applies to "cases

brought by state-court losers complaining of injuries caused by state-court judgments rendered

before the district court proceedings commenced and inviting district court review and rejection of

those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

In their Complaint, Plaintiffs raise various issues concerning the 2007 and 2008 disciplinary

proceedings and appeals.  Even under a liberal construction, it is clear that Plaintiffs seek the Court's

review of the proceedings and an order vacating the disciplinary decisions.

Judge Brimmer heard argument regarding this same defense in response to Plaintiffs' motion

for preliminary injunction in 09-cv-02052. Hearing Transcript, at 7-24, docket #35. Judge Brimmer concluded that the 2007 state proceedings were final, the court was barred from any type of review, and the Plaintiffs' "only recourse is through some type of appeal to the United States Supreme Court." *Id.* at 24: 2-6. Similarly, although the disciplinary action in 08 PDJ 059 was proceeding through the state appellate court at the time of the hearing, Judge Brimmer determined that the action fell within the *Rooker-Feldman* prohibition pursuant to *Kenman Eng'g v. City of Union*, 314 F.3d 468, 474 (10th Cir. 2002), *overruled in part by Lance v. Dennis*, 546 U.S. 459 (2006), because a state court judgment was rendered before the action in this Court commenced and the Plaintiffs' "remedies are to continue their appeals or any appeals that may be available to them up through the state court proceedings through the Colorado Supreme Court and then on to the United States Supreme Court." *Id.* at 24: 7-20. Here, apparently, there has been a final decision in the Colorado courts; however, similar to Judge Brimmer's ruling concerning 07 PDJ 067, the Court finds no reason to deviate from Judge Brimmer's ruling concerning 08 PDJ 059. Thus, this Court recommends that the District Court find it would be prohibited from ruling on Plaintiffs' claims for injunctive and declaratory relief concerning the 2007 and 2008 disciplinary proceedings pursuant to the bar mandated by the *Rooker-Feldman* doctrine.

3.    Declaratory Relief for Alleged First Amendment Violations

Plaintiffs' assertions of entitlement to declaratory relief concerning the confidentiality attached to an exhibit filed under seal in this case and to certain materials in judges' application files are supported by no factual averments whatsoever. As such, the Court recommends that the District Court find such potential claims to be in violation of Fed. R. Civ. P. 8. *See Iqbal,* 129 S.Ct. at 1949.

D.    Remaining Individual Defendants

Plaintiffs seek to bring claims against "media defendants" Don Knox and Circuit Media, LLC and against "private defendants" Victor Boog, Glenn Porzak, Nelson Lane, Robert Swenson,

Bruce Anderson and Judith Anderson.  Specifically, according to the Complaint, Plaintiffs bring their First, Second, Third and Fourth Claims for relief against the "private defendants" pursuant to 42 U.S.C. § 1983, the Sixth Claim for Relief is for defamation and intentional infliction of emotional distress against the "media defendants," the Seventh and Eighth Claims for Relief are for malicious prosecution and/or abuse of process against the "private defendants," and the Twelfth Claim for Relief alleges violations of RICO and the Colorado Organized Crime Control Act ("COCCA") against both "private" and "media" defendants.[11]  In addition, although not specifically pled as a claim for relief and although the Court need not construe the Complaint liberally, in an ongoing effort to be thorough, this Court reads the Complaint to contain a potential claim for civil conspiracy pursuant to 42 U.S.C. § 1985(3) against both the "media" and "private" defendants.  (*See* Complaint at 1 ("[t]his complaint seeks damages for a conspiracy to deprive the plaintiffs of their rights guaranteed them under the Constitution and laws of the United States").)

First, private individuals may not be sued pursuant to Section 1983.  "To state a claim under § 1983 a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Plaintiffs make no allegations that any of the "private defendants" or acted under color of state law.  Thus, any potential claims for due process or equal protection violations under the Fourteenth Amendment are not justiciable against the "private defendants" listed here.

Second, Plaintiffs' potential claims for conspiracy pursuant to Section 1985, to the extent they exist, are not viable here because the Plaintiffs allege no "racial or perhaps otherwise class-based invidiously discriminatory animus." *See Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993), *cert. denied*, 510 U.S. 1093 (1994), (citing *Griffin v. Breckenridge*, 403 U.S. 88, 101-02));

---

[11]Notably, the Plaintiff alleges no "Ninth Claim for Relief" in the Complaint.

*see also Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994) ("[a] violation of section 1985 must include class-based or racially discriminatory animus"). The language of this requirement has been narrowly construed and does not reach conspiracies motivated by an economic or commercial bias. *Id.* (citing *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 837 (1983)). Political affiliation is not a class protected by Section 1985(3). *See Brown v. Reardon*, 770 F.2d 896, 906 (10th Cir. 1985); *see also Wilhelm v. Continental Title Co.*, 720 F.2d 1173, 1175 (10th Cir. 1983) (citing *Scott* and stating that the Supreme Court "made it clear that § 1985(3) did not cover conspiracies motivated by economic, political or commercial bias"); *Perez-Sanchez v. Public Bldg. Auth.*, 531 F.3d 104, 108-09 (1st Cir. 2008) (announcing that a majority of circuits have found that political affiliation is not protected under Section 1985(3) and listing cases). Therefore, to the extent Plaintiffs attempt to claim relief in this matter pursuant to 42 U.S.C. § 1985(3), the Court recommends that the District Court deny Plaintiffs' permission to amend the complaint.

Third, with respect to their RICO claims, Plaintiffs fail to identify which particular portion of the statute is invoked. However, the Court will assume from the language used in Plaintiffs' allegations that their potential claims are brought pursuant to 18 U.S.C. § 1962(c), which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (West 2011). To state a claim under RICO's section 1962(c), Plaintiffs must allege four statutory elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1100 (10th Cir. 1999); *see also Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1555 n.7 (10th Cir. 1992).

A group, sufficient to qualify as an association-in-fact enterprise, must have (1) a purpose,

47

(2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009) (citing *Boyle v. United States*, – U.S. –, 129 S. Ct. 2237, 2244 (2009)). Members of the group must share a common purpose of engaging in a course of conduct, and there must be evidence that members have "joined together" to advance a certain object or engage in a course of conduct. *Id.* at 1021-22 (internal brackets and quotations omitted).  Finally, the group must associate on the basis of its shared purpose for a "sufficient duration to permit an association to participate in the affairs of the enterprise though a pattern of racketeering activity." *Id.* at 1022 (internal brackets and quotations omitted).

Here, Plaintiffs allege the existence of two enterprises: (1) an association-in-fact of Elk Dance Colorado, LLC, its successors in interest and its associates, the purpose of which was the "use of the courts to transfer property of Spring Creek Ranchers' Association, and of individual homeowners within Spring Creek Ranch including Lewis, to Elk Dance, Boog, the Swenson Group, or their associates"; and (2) an "expanded enterprise" comprised of the "defendants," MDC Holdings, various law firms, former state officials and "various financial institutions," the purpose of which was to "severely punish" and cause harm to Maynard, and to prevent her from practicing law or seeking political office "ever again."  (*See* Complaint, ¶¶ 211-215.)

With respect to the first enterprise, the Court recommends finding that Plaintiffs' claim is facially barred by the applicable statute of limitations.  A civil RICO action pursuant to 18 U.S.C. § 1962(c) is subject to the four-year limitations period set forth in Section 4B of the Clayton Act. *Kripp v. Luton*, 466 F.3d 1171, 1177-78 (10th Cir. 2006) (affirming a trial court's dismissal of a RICO claim "on its face" for failure to file the claim within the statute of limitations).  All of Plaintiffs' allegations concerning Spring Creek Ranch took place well before Judge Lass' final decision in 2002 and clearly before Maynard's filing of the RICO and COCCA claims in this Court

in 2003 based upon the same set of facts.  In fact, it is clear by the enterprise's purpose, stated by

the Plaintiffs, that Plaintiffs' RICO claim based upon the Spring Creek allegations is time-barred:

"use of the courts to transfer property of Spring Creek Ranchers' Association ... to Elk Dance, Boog,

the Swenson Group or their associates."  According to the Complaint, all litigation concerning such

property transfer(s) occurred before 2003, thus launching Maynard's subsequent lawsuits concerning

the transfer(s).  Moreover, Plaintiffs' allegations contain no information indicating the statute should

be tolled, *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997), nor will the fact that the claim

is alleged together with a facially timely claim make it timely.  *Kripp*, 466 F.3d at 1178 (finding that

untimely claims are not brought within the statute of limitations merely by being packaged with

timely-filed claims).  Accordingly, the Court recommends that the District Court deny the Plaintiffs

permission to allege a RICO claim in this matter concerning Spring Creek Ranch.

 With respect to the second enterprise, the Court finds that Plaintiffs' allegations fail to

comply with Fed. R. Civ. P. 8 and 9(b).  The requirement of Fed. R. Civ. P. 9(b) that allegations of

fraud be pled with particularity apply to RICO claims.  *Farlow v. Peat, Marwick, Mitchell & Co.*,

956 F.2d 982, 990 (10th Cir. 1992).  "Under Rule 9(b), plaintiffs must sufficiently allege each

element of a RICO violation and its predicate acts of racketeering with particularity, a requirement

justified by the 'threat of treble damages and injury to reputation.'" *Id.* (quoting *Cayman*

*Exploration Corp. v. United Gas Pipe Line*, 873 F.2d 1357, 1362 (10th Cir. 1989).

 For purposes of this Recommendation, the Court assumes that Plaintiffs assert sufficient

allegations to meet the first and second requirements necessary to state a RICO claim concerning

the second enterprise.  Racketeering activity is defined as any "act which is indictable" under federal

law and specifically includes mail fraud, wire fraud, obstruction of justice and tampering with a

witness, all of which are alleged by the Plaintiffs in this case.  *See* 18 U.S.C. § 1961(1)(B) (West

2011).  "These underlying acts are 'referred to as predicate acts, because they form the basis for

liability under RICO.'" *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (quoting *BancOklahoma Mortg. Corp. v. Captial Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999)).

"[W]itness tampering is actionable under 18 U.S.C. § 1512 only if it takes place 'in an official proceeding,' which is defined in § 1515(a)(1) to include only federal proceedings. Accordingly, tampering with a witness in a state judicial proceeding ... is not a RICO predicate act." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003). Moreover, the "clear intent" of the obstruction of justice statute, 18 U.S.C. § 1503, is to protect individuals assisting in a federal investigation or judicial proceeding. *United States v. Cuesta*, 597 F.2d 903, 918 (5th Cir.), *cert. denied*, 444 U.S. 964 (1979). Here, Plaintiffs make no allegations of tampering with a witness or obstruction of justice in a federal investigation or proceeding; therefore, no RICO claims may be based upon the predicate acts of witness tampering or obstruction of justice in this matter.

Plaintiffs also allege the predicate acts of mail fraud and wire fraud. A pattern of racketeering activity requires at least two acts of racketeering activity, but the two acts themselves may not be sufficient to establish a pattern. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985). To satisfy RICO's pattern requirement, Plaintiffs must plausibly allege sufficient continuity of conduct. *Hall v. Witteman*, 584 F.3d 859, 867 (10th Cir. 2009) ("RICO is not aimed at the isolated offender."). Plaintiffs must allege "not only that the defendants had committed two or more predicate acts, but also 'that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity.'" *Id.* (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)) (emphasis in original). Allegations of "a closed-ended series of predicate acts constituting a single scheme to accomplish a discrete goal ... directed at only one individual with no potential to extend to other persons or entities" do not articulate the requisite pattern of continuing racketeering activity. *Id.* (citation omitted). Such claims may refer to a common scheme, but fail to describe a threat of continuing criminal activity. *See Duran v. Carris,* 238 F.3d 1268,

1271 (10th Cir. 2001).

In this case, Plaintiffs allege that the purpose of the second enterprise is to harm Maynard in various respects, such as economic harm, intimidation, and harm to reputation. (Complaint, ¶ 215.) The Court will assume, for purposes of this Recommendation, that the second enterprise describes a group of persons and entities that has taken actions against Maynard personally and whose actions occurred within RICO's statute of limitations. Plaintiffs fail to allege with particularity in accordance with Fed. R. Civ. P. 9(b) which predicate acts by which Defendants have caused Maynard the various harms; as such, Plaintiffs would be properly denied permission to assert their claims pursuant to RICO against the "private" and "media" Defendants in this matter. However, assuming Plaintiffs allege that the "private" and/or "media" Defendants engaged in predicate acts of mail fraud and wire fraud, Plaintiffs assert no allegations (much less those with particularity) regarding any such acts taken to harm Maynard in the ways described above.[12] Further, Plaintiffs' allegations concerning the second enterprise fail to describe a threat of continuing criminal activity but, instead, describe only "a closed-ended series of predicate acts constituting a single scheme to accomplish a discrete goal ... directed at only one individual with no potential to extend to other persons or entities." *See Hall*, 584 F.3d at 867. Consequently, this Court recommends that the District Court deny the Plaintiffs permission to assert RICO claims against the remaining individual Defendants in this matter.

---

[12]In paragraph 217(c) of the Complaint, Plaintiffs incorporate by reference "all allegations the Plaintiffs made in connection with case 03CV126 (including at the preliminary injunction hearing in November-December 2003)" and which consist of "numerous instances of mail fraud, wire fraud [and other acts] ... committed by Swenson, the Andersons, the Beatties [not named as Defendants in this matter], and Boog." These allegations are conclusory and in contravention of Fed. R. Civ. P. 9(b). Moreover, to the extent that these allegations concern the Spring Creek Ranch litigation, they have been determined by this Court to be facially time-barred. Further, Maynard fails to allege how she herself was personally harmed by an enterprise whose purpose was to "use the courts to transfer property." Therefore, the Court finds that such allegations are insufficient to state a viable RICO claim in this matter.

Finally, with respect to the state law claims for violations of the COCCA, defamation, intentional infliction of emotional distress, malicious prosecution and/or abuse of process, this Court recommends that the District Court decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).   In this matter, the Court has recommended that the District Court find Plaintiffs have insufficiently alleged all federal constitutional and statutory claims over which this Court would have original jurisdiction; thus, declining to exercise pendent jurisdiction over any potential state law claims is proper.  *See Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010).

E.      Remaining Potential Claims

Plaintiffs assert their Tenth Claim for Relief for alleged violations of the Colorado Antitrust Act of 1992 against the OARC Officials and Justice Mullarkey, and their Eleventh Claim for Relief for alleged violations of the Clayton Act, 15 U.S.C. § 15 against the OARC Officials, Supreme Court Justices, and Judge Daniel and Magistrate Judge Tafoya of this Court.

First, for the same reasons listed above, this Court recommends that the District Court decline to exercise supplemental jurisdiction over the Colorado antitrust claim.

Second, the allegations supporting the claims under the Clayton Act are based solely on alleged conduct taken by Judge Daniel and Magistrate Judge Tafoya.  (Complaint, ¶¶ 203-206.) However, Plaintiffs dismissed Judge Daniel and Magistrate Judge Tafoya as Defendants in 10-cv-01850 on September 7, 2010.  (Docket #7.)  To the extent that Plaintiffs seek to bring claims under the Clayton Act against other Defendants (OARC Officials and Justice Mullarkey), such claims are vague and not supported by factual averments in contravention of Fed. R. Civ. P. 8.  Moreover, the Plaintiffs' allegations, if construed liberally, are barred by the state action immunity doctrine.

"The 'state action immunity' doctrine originated in *Parker v. Brown,* 317 U.S. 341 (1943), and 'exempts qualifying state and local government regulation from federal antitrust, even if the regulation at issue compels an otherwise clear violation of federal antitrust laws.'" *Zimomra v.*

*Alamo Rent-A-Car, Inc.,* 111 F.3d 1495, 1498 (10th Cir. 1997) (quoting *Cost Mgmt. Servs. v. Washington Natural Gas Co.,* 99 F.3d 937, 941 (9th Cir. 1996)). The doctrine applies to protect state legislatures and state supreme courts, acting in their legislative capacities, as well as to other individuals or entities acting pursuant to state authorization. *Id.* (citing *Hoover v. Ronwin,* 466 U.S. 558, 568 (1984)); *see also Oberndorf v. City & Cnty. of Denver,* 696 F. Supp. 553, 558 (D. Colo. 1988) (state officials are entitled to immunity for activities directed by state legislature, even if those acts have anti-competitive results). However, the state immunity doctrine applies only to state officials acting pursuant to a "clearly articulated and affirmatively expressed state policy." *Hoover*, 466 U.S. at 569.

"Article VI of the Colorado Constitution grants the Colorado Supreme Court jurisdiction to regulate and control the practice of law in Colorado to protect the public." *Smith v. Mullarkey,* 121 P.3d 890, 891 (Colo. 2005) (internal citations omitted). Under this authority, the alleged actions taken by Justice Mullarkey, as Chief Justice of the Colorado Supreme Court, clearly fall within the "state action immunity" doctrine. Moreover, pursuant to the Colorado Supreme Court's authority under Article VI of the Colorado Constitution, the supreme court enacted Colo. R. Civ. P. 251.3, which charges the OARC with receiving, investigating, and prosecuting, where appropriate, disciplinary complaints against Colorado lawyers. *See* Colo. R. Civ. P. 251.3(c)(4). Thus, the OARC's prosecution of disciplinary complaints against Maynard were brought pursuant to a "clearly articulated and affirmatively expressed state policy" and, as such, are similarly encompassed by the state action immunity doctrine. *Hoover,* 466 U.S. at 569. Consequently, this Court recommends that the District Court deny Plaintiffs permission to bring any potential claims under the Clayton Act in this matter.

## **CONCLUSION**

In response to Judge Kane's order striking Plaintiffs' Complaints in 09-cv-02052 and 10-cv-01850, Plaintiffs have asserted that they rely on the allegations pled in their Complaints to support their potential claims in this matter.   Upon review of such allegations and after hearing the matter on May 11, 2011, this Court finds that Plaintiffs have failed to assert "short and plain statement[s]" of the grounds for the Court's jurisdiction in accordance with Fed. R. Civ. P. 8(a)(1) or of a "claim showing that the pleader is entitled to relief" in accordance with Fed. R. Civ. P. 8(a)(2). Accordingly, based upon the entire record herein, the Court RECOMMENDS that the District Court deny Plaintiffs permission to file an Amended Consolidated Complaint.

Respectfully submitted at Denver, Colorado, this 18th day of July, 2011.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge